# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

AMERICAN STEAMSHIP CO.,
ARMSTRONG STEAMSHIP CO.,

        Plaintiffs,

v.

HALLETT DOCK CO.,
FRASER SHIPYARDS, INC.,
RJS CONSTRUCTION LLC,
CHRIS JENSEN & SON, INC.,
REUBEN JOHNSON & SON, INC.,

        Defendants.

**Memorandum of Law & Order**
Civil No. 09-2628 (MJD/LIB)

---

Gerardo Alcazar, Brent L. Reichert, David E. Bland, and Richard B. Allyn, Robins, Kaplan, Miller & Ciresi L.L.P., Counsel for Plaintiffs.

David R. Hornig and Guerric S.H.L. Russell, Nicoletti Hornig & Sweeney, and John D. Kelly and Scott A. Witty, Hanft Fride, P.A., Counsel for Defendant Hallett Dock Co.

Nicholas Ostapenko and Paul W. Wojciak, Johnson Killen & Seiler, and Edward C. Radzik and Laura V. Block, Marshall, Dennehey, Warner, Coleman & Goggin, Counsel for Defendant Fraser Shipyards, Inc.

Daniel A. Haws, John Paul J. Gatto, and Krista J. Robertson, Murnane Brandt, PA,  Counsel for RJS Construction, LLC, Chris Jensen & Son, Co., Inc., and Reuben Johnson & Son, Inc.

---

I.     **Summary of Decision**

This case involves claims by the owners of the Walter J. McCarthy, Jr., a

one thousand foot freight ship which was damaged when it struck debris as it

attempted to berth at a Superior, Wisconsin dock on January 14, 2008.  The

accident opened a large gash in the McCarthy's hull and is alleged to have

caused more than four million dollars in damage.  The McCarthy's owners

brought suit against the various defendants named above, all of whom are

alleged to have played a role in the accident.  This case proceeded through

discovery, with each party having an opportunity to depose the individuals

involved in the accident and to collect other relevant evidence.  As might be

expected, the record reveals divergent accounts of the day of the accident and the

time leading up to it.  Conflicting testimony abounds.  Each party has attempted

to push to the blame away from itself and toward others.

The parties have now filed a series of motions, asking the Court to grant

summary judgment in their favor on questions of liability and various other legal

issues.  The general rule of the federal maritime law that governs this case

provides that all parties responsible for the accident shall be liable for the

damages.  Damages are apportioned among the responsible parties according to

their relative contribution to the accident.

This Court cannot grant summary judgment where material factual disputes persist; fact issues are for a jury at trial. Because of the numerous factual disputes that remain in this case, the Court cannot determine at this stage the total amount of damages caused by the accident, which parties are liable for the damages, or to what extent the each of the responsible parties contributed to the accident.

Although the Court concludes that the majority of the issues raised by the parties must be resolved by a jury, the Court has granted summary judgment on a few limited issues. The <u>Pennsylvania</u> Rule is maritime rule which comes into play when a party involved in an accident has violated certain maritime statutes and regulations. The Court concludes that the undisputed evidence shows that Hallett Dock Co., the owner of the dock at which the McCarthy was damaged, violated one or more maritime rules when it created and failed to mark debris in the slip where the McCarthy was to be berthed. The burden at trial will therefore fall on Hallett to prove that its negligence did not contribute to the accident.

The Court also concludes that certain warranty claims advanced by the McCarthy's owners are not supported by the law or the evidence developed in discovery. Such claims need not proceed to a jury and will be dismissed.

3

## II.     Introduction

This matter is before the Court on:  (1) a motion for partial summary

judgment by Plaintiffs American Steamship Company and Armstrong Steamship

Company (collectively, "ASC") against all Defendants on the issue of damages

[Docket No. 164]; (2) a motion for partial summary judgment by ASC against

Defendant Hallett Dock Company ("Hallett") [Docket No. 160]; (3) a motion for

partial summary judgment by Hallett [Docket No. 168]; (4) a motion for

summary judgment by Defendant Fraser Shipyards, Inc. [Docket No. 173]; (5) a

motion for partial summary judgment by Defendant Chris Jensen & Son, Inc.

[Docket No. 156]; and (6) a motion for partial summary judgment by Defendants

RJS Construction LLC and Reuben Johnson & Son, Inc. [Docket No. 151].  ASC

and Hallet have also moved to supplement the record [Docket Nos. 266, 276,

311], and ASC has moved to strike Hallett's motion [Docket No. 286].  The Court

heard oral argument on Friday, October 28, 2011.

## III.     Background

This case arises out of an accident involving the Walter J. McCarthy, Jr.

("McCarthy"), a one thousand foot freight ship owned and operated by ASC.  On

January 14, 2008, the McCarthy struck underwater debris as it was entering a slip

at a Superior, Wisconsin dock owned by Hallett.  The collision[1] caused a seven by

four foot gash in the hull, grounding the ship and allowing water to enter the

hull and engine room.  The flooding caused extensive damage.

**A. Hallett Dock Number 8**

The McCarthy accident occurred at Hallett Dock Number 8 ("Dock No.

8"), a commercial dock and commodity storage site on the south shore of the

Duluth/Superior Harbor.  Dock No. 8 runs north from the shore alongside a slip

which is 2,200-2,300 feet long and 151 feet wide.  Dock No. 8 is used primarily to

load and unload bulk commodities.

In October 2006, a 180 foot section of the dock wall collapsed into the slip.

The collapsed area began approximately 330 to 250 feet north of the southern end

of the slip and ended approximately 510 to 540 feet north of the south end of the

slip.  A concrete and rebar mooring house measuring 10 by 10 by 12 feet fell into

the slip near the north end of the collapsed section.

In the spring of 2007 Hallett hired Marine Tech, LLC to replace the

collapsed dock section and to clean up debris that fell into the slip.  Marine Tech

---

[1] The term "collision" has traditionally referred to an accident between two moving vessels, while "allision" referred to a vessel's contact with a stationary object.  Black's Law Dictionary (9th ed. 2009).  In modern cases, "collision" is often used in the same context as "allusion," id., and in this Order, the Court uses the terms interchangeably.

reconstructed the dock, installing a new dock wall, pilings, and six new yellow

mooring bollards, which are used to tie up ships at the dock.  This work was

completed in the summer of 2007.  Marine Tech also dredged some portion of the

slip where the dock collapsed, but it did not remove all of the debris before the

winter.  In October or November 2007, Marine Tech conducted soundings of the

slip to determine the depth of the slip at five foot intervals.  The soundings

revealed an area several feet shallower than surrounding areas.  (First Alcazar

Decl. [Docket No. 163], Ex. 12.)  All areas <u>north</u> of the first new yellow bollard

appear to have been clear and unobstructed during the winter of 2007-2008.

While Hallett had marked the area containing the debris using buoys, it is

undisputed that the buoys were removed before the winter and there were no

physical warnings of debris in or around the slip as of January 2008.

## B.  Negotiations to Dock the McCarthy at Dock No. 8

ASC marine superintendent Ken Gliwa visited Dock No. 8 in September

2007 to assess whether it would be suitable for the McCarthy's "winter layup"—

a time when the ship is docked to perform maintenance and to avoid extreme

winter conditions.  That month, Gliwa sent a letter to Hallett reserving the dock,

and Hallett agreed to "provide mooring for [the McCarthy] during the winter

layup period."  (First Alcazar Decl., Ex. 7.)  ASC contends that this agreement

called for Hallett to assist with the mooring by providing guiding, spotting, and

tie-up services.  Hallett denies that it agreed to provide such services, asserting

that it agreed only to allow ASC to moor the McCarthy at Dock No. 8.  In

exchange for mooring the ship at Dock No. 8, ASC agreed to pay for a new

electrical service at the dock.  (First Alcazar Decl., Ex. 9.)

ASC entered into a separate agreement with Defendant Fraser Shipyard

Shipyards, Inc. ("Fraser"), under which Fraser would repair the McCarthy over

the winter and also "provide line and anchor handling" upon the McCarthy's

arrival for winter layup.  (Radzik Decl. [Docket No. 177], Ex. 8.)

### C.  December 6 Phone Call

ASC alleges that Al Desmond, the McCarthy's Chief Engineer, had a

telephone conversation with Hallett President Mike McCoshen on December 6,

2007, and during that conversation McCoshen told Desmond that the debris in

the slip had been cleaned up and that the slip was at least 21 feet deep up to

1,800 feet back from the opening of the slip.  (Desmond Dep., First Alcazar Decl.,

Ex. 14 at 314:9-13.)  Desmond typed notes to that effect.  (First Alcazar Decl., Ex.

13.)  McCoshen states that he does not recall such a conversation and denies that

he would have given the information alleged by Desmond because that

information would have been "incomplete or erroneous."  (McCoshen Aff.,

Hornig Aff. [Docket No. 226], Ex. A, ¶¶ 8-9, 15-16.)

### D. The January 10 Meeting

A pre-arrival meeting was held at Dock No. 8 on January 10, 2008 ("the

January 10 meeting").  Present at that meeting were Gliwa, McCoshen, and Mike

Podgorak.  Podgorak is a truck supervisor employed by Defendant Chris Jenson

& Son (CJS).  Podgorak has testified that he attended the meeting in place of

Dave Whitehead, a Fraser employee, and also to represent Defendant Reuben

Johnson, which had been asked to provide snow removal services at the dock.

(Podgorak Dep., Fourth Alcazar Decl. [Docket No. 224], Ex. 11 at 92:5-9, 112:1-

17.)  Gliwa has asserted that he believed Podgorak to be a Fraser employee who

was also at the meeting to represent Reuben Johnson and Defendant RJS

Construction LLC.  (Gliwa Aff., Fourth Alcazar Decl., Ex.8, ¶ 3.)

While the parties present at the meeting have differing recollections, all

agree that McCoshen stated that the McCarthy should be docked north of the

first yellow bollard.  They disagree about the extent to which McCoshen

explained that there was debris in the slip past that point or warned that the

debris posed a danger.

According to Gliwa, he advised both McCoshen and Podgorak that he would be traveling the weekend before the docking of the McCarthy and that there was a chance that he would not be present when the McCarthy arrived at Dock No. 8.  (Gliwa Dep., First Alcazar Decl., Ex. 11 at 207:9-21.)  McCoshen remembers that Gliwa told him about his travel plans but denies that Gliwa told him that he might not be back by January 14.  (McCoshen Aff. ¶ 14.)

### E.  January 11-13

Podgorak has testified that, after the January 10 meeting, he communicated the intended docking location to Whitehead twice before January 14.  (Podgorak Dep., First Alcazar Decl., Ex. 15 at 19:19-20, 145:12-147:17.)

On January 13, 2008, Bryon Petz, a McCarthy crew member called McCoshen.  Petz has testified that McCoshen confirmed the depth figures that he had allegedly given to Desmond in the December 6 phone call, indicating that there was at least 21 feet of water 1,800 feet into the slip.  (Petz Dep., First Alcazar Decl., Ex. 18 at 24:3-8.)

### F.  The January 14, 2008 Accident

The McCarthy arrived at the head of the slip at approximately 9:45 a.m. on January 14, 2008.  Due to a flight problem, Gliwa was not able to be present that morning.  Tug boats were used to break up the ice which covered the slip.  At

around 10:00 a.m. Podgorak and Fraser employee Dave Whitehead drove to the

dock.  According to Podgorak, he then told Whitehead for the third time that the

McCarthy should be stopped north of the first yellow bollard.  (Podgorak Dep. at

155:12-17.)  Whitehead denies ever having been told that crucial piece of

information.  (Whitehead Statement, First Alcazar Decl., Ex. 26.)  At this point,

the McCarthy was in the north end of the slip, moving slowly south.  Whitehead

drove Podgorak to the Fraser Shipyard and dropped him off there.  Podgorak

was not present on the dock from that point onward.

Whitehead returned to the dock.  According to McCarthy crewmembers,

Whitehead and two other Fraser employees proceeded to guide or "spot" the

McCarthy from a truck on the dock.  (Desmond Dep., Fourth Alcazar Decl., Ex.

17 at 96:2-25.)  The Fraser employees spoke with the ship's crew through an

engine room door in the stern of the ship and via radio.  Whitehead has stated

that he suggested backing the McCarthy further into the slip, but denies that he

was acting as a spotter.  Hallett Dock Superintendent Clyde Jago was also on the

dock, but he apparently observed the docking from a distance and did not

communicate with the crew of the McCarthy or the Fraser spotters.

The McCarthy initially came to a stop approximately 50 to 100 feet north of the first yellow bollard.   According to the McCarthy crewmembers, Whitehead directed the McCarthy to proceed further south because a Fraser crane to be used for lay-up maintenance and repairs would not be able to reach the McCarthy from the location north of the yellow bollard.  (Desmond Aff., Fourth Alcazar Decl., Ex. 17, ¶¶ 10-13.)  The McCarthy had some difficulty following Whitehead's instruction to move further south, apparently on account of ice in the slip.  When the McCarthy was finally able to proceed backward, it shortly thereafter struck something which caused a seven by four foot hole in the ship's hull.  No one on the dock told had instructed the McCarthy's crew not to proceed past the first yellow bollard or warned them about the debris.

### G. Damage and Repairs to the McCarthy

The gash in the McCarthy's hull caused significant damage.  As a result of the holing, water flooded part of the engine room, damaging the diesel motors and other mechanical equipment.  A large piece of concrete and rebar was later found inside of the engine compartment.  The McCarthy became grounded next to the slip.  Immediately after the holing and flooding, Gliwa arranged for the delivery of heaters and generators to prevent the water in the engine room from

11

freezing.  Fraser's employees also took steps to mitigate damage and prevent the McCarthy from becoming a total constructive loss.

Jared Aquilla, a marine surveyor from North American Marine, Inc. ("NAM"), arrived shortly after the incident to assess the damage and oversee the necessary repairs.  Aquilla worked with Pierre Pelletreau (ASC's Fleet Engineer), Fraser, and other subcontractors to oversee repairs to the McCarthy.  Repairs to the McCarthy were completed on May 6, 2008.  On February 19, 2009, Aquilla submitted a Report of Survey which listed necessary repairs and assessed the reasonableness of the charges.  (Second Alcazar Decl. [Docket No. 167], Ex. 9.) The report lists the following items as the sources of ASC's repair costs and other expenses: hull and cleanup; propulsion; generators; electrical; auxiliary machinery; crew expenses; and miscellaneous expenses.  Aquilla also submitted an expert report on February 25, 2011 at ASC's request.  Aquilla's report identified three categories of expenses related to the holing and flooding of the McCarthy:  (1) total cost of repairs and expenses, $4,128,524.82; (2) cost to hire NAM to serve as contractor and oversee the repairs, $146,178.90; and (3) costs for anti-pollution efforts, $132,906.36.  (Second Alcazar Decl., Ex. 10 at 44.)

### H. Procedural History

ASC filed a six count complaint against the various defendants, alleging

negligence (Count I), breach of contract (Count II), breach of implied warranty of

workmanlike performance (Count III), breach of implied warranty of fitness for a

particular purpose (Count IV), breach of express warranty (Count V), and

negligent misrepresentation (Count VI).  Discovery ensued, producing

voluminous records and conflicting deposition testimony.  The parties have now

moved for summary judgment on a variety of different issues:

(1)  ASC has moved for partial summary judgment on the amount of

damages that it sustained as a result of the holing and sinking of the McCarthy.

(2)  ASC has also moved for a partial summary judgment ruling that Hallett was

at fault for the accident.  (3)  Hallett, in turn, has moved for a summary judgment

ruling that it was not at fault for the accident.  Hallett further argues that

summary judgment is warranted as to Counts III and IV and also as to ASC's

claim for damages related to anti-pollution efforts.  (4)  Fraser has moved for

summary judgment as to all counts.  (5)  Chris Jensen & Son has moved for

summary judgment as to Counts II, III, IV, and V.  (6)  Finally, Reuben Johnson

and RJS Construction LLC have moved for summary judgment on all counts.

## IV.   Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact.  Id. at 323.  Summary judgment is appropriate only when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Id.  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## B.  Motions to Supplement the Record

Three motions have been filed to supplement the factual record in this case.  In each instance the parties' have sought to include newly produced evidence.  As the Court already indicated at oral argument, the Court will grant the two motions made prior to the hearing.  [Docket Nos. 266 & 276.]  The Court will also grant Hallett's more recent motion to supplement the record.  [Docket No. 311.]

## C.  Motions for Summary Judgment on the Issue of Damages

ASC seeks summary judgment that it has established over $4 million in "undisputed expenses" as a direct result of the holing and flooding of the McCarthy.  Defendants Hallett and Fraser have filed individual oppositions to ASC's motion, which the other Defendants have joined.  Defendants argue that the cost of repairs is a disputed fact issue which should be left to the jury.  They also argue that summary judgment is inappropriate because they intend to assert contributory negligence and salvage claims.  Defendants further contend that ASC has improperly included the costs of surveying and anti-pollution efforts in the total damages amount, and Hallett has moved the Court for summary judgment on the question of the expenses arising out of the anti-pollution efforts.

### 1. Damages in Admiralty

The parties agree that this case falls under the Court's admiralty

jurisdiction.  <u>See</u> U.S. Const. Art. III, § 2.

> With admiralty jurisdiction comes the application of substantive
> admiralty law.  Absent a relevant statute, the general maritime law,
> as developed by the judiciary, applies.  Drawn from state and
> federal sources, the general maritime law is an amalgam of
> traditional common-law rules, modifications of those rules, and
> newly created rules.

<u>E. River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 864-865 (1986)

(citations and footnote omitted); <u>see</u> 1 Thomas J. Shoenbaum, <u>Admiralty and</u>

<u>Maritime Law</u> § 4-1 (5th ed. 2011).  When necessary, relevant state law may be

used to fill gaps in general maritime law.  <u>Spiller v. Thomas M. Lowe, Jr., &</u>

<u>Associates, Inc.</u>, 466 F.2d 903, 910 n.9 (8th Cir. 1972) ("[I]t has long been held that

even though admiralty suits are governed by federal substantive and procedural

law, courts applying maritime law may adopt state law by express or implied

reference or by virtue of the interstitial nature of federal law.").

In general maritime law, standard recovery for a vessel damaged in a

collision or allision is the cost of repairs.  <u>The Baltimore</u>, 75 U.S. 377, 386 (1869);

<u>see</u> 2 Shoenbaum, <u>supra</u>, § 14-6.  The owner is entitled to "sufficient damages to

put his vessel into a condition as seaworthy and serviceable as before the

collision." Pinto v. M/S Fernwood, 507 F.2d 1327, 1331-32 (1st Cir. 1974).   Such

damages are subject to a reasonableness determination.  See, e.g., Zeller Marine

Corp. v. Nessa Corp., 166 F.2d 32, 34 (2d Cir. 1948).  Other incidental costs paid

during the course of repairs "are also fully recoverable if reasonably incurred."  2

Shoenbaum, supra, § 14-6 n.12-n.21; see Pilot River Transp., Inc. v. Chic. & N.W.

Transp. Co., 912 F.2d 967, 971 (8th Cir. 1990).

Once the total level of damages is determined, those damages are allocated

among the responsible parties.  In United States v. Reliable Transfer Co., 421 U.S.

397, 411 (1975), the Supreme Court abandoned the admiralty rule of divided

damages—under which damages were equally divided between all responsible

parties—in favor of allocating damages on a more familiar comparative fault

basis.  See In re Am. Milling Co., Ltd., 409 F.3d 1005, 1020 (8th Cir. 2005).  Thus,

in this case, ASC will bear the burden of proving its total damages, and the

inquiry will then shift to a determination of the contributing parties' comparative

fault.

### 2.  ASC's Motion for Summary Judgment as to Total Damages

The "undisputed expenses" set forth by ASC break down as follows:

|  |  |
|---|---|
| Repair Costs: | $4,020,524.82 |
| Surveying Costs: | $ 146,178.90 |

Anti-Pollution Efforts:    $   132,906.36

TOTAL                      $4,299,610.08

ASC notes that Jared Aquilla of North American Marine surveyed the damaged vessel and oversaw its repair.  Aquilla concluded that all the repairs done were necessary, reasonable, fair, and directly related to the January 2008 incident. ASC further points out that none of the Defendants have provided expert testimony which might contradict the amount of damages identified in Aquilla's report.  ASC also highlights that some of Fraser's own employees, Gene Walroos and Mike Peterson, confirmed that the repairs done were necessary and reasonable.  (See Walroos Dep., Second Alcazar Decl., Ex. 6 at 219:23-221:15; Peterson Dep., Second Alcazar Decl., Ex. 14 at 192:3-11.)  ASC therefore contends that there are no genuine issues of material fact as to $4,299,610.08 of their claimed expenses.  At the same time, ASC admits that there exists at least another $108,000 in "potentially disputed repair costs" in addition to the "undisputed" damages noted above.

Defendants contend that the amount of the repair costs is a disputed issue which must be proven by ASC at trial and which should be left to the jury. Defendants note that they have never admitted to the amount of expenses

18

claimed by ASC and state that they will dispute at trial both the scope and

reasonableness of such expenses.  Hallet asserts, for example, that some of the

repairs listed in Aquilla's report were already scheduled to occur during winter

lay-up.

"The determination of the amount of damages is peculiarly within the

province of the jury."  Taylor v. Otter Tail Corp., 484 F.3d 1016, 1020 (8th Cir.

2007) (citation omitted); see, e.g., Snyder v. City of Minneapolis, 441 N.W.2d 781,

789 (Minn. 1989) ("Ordinarily, the amount and extent of damages is a question of

fact.").  For this reason, the Court declines to establish the damages "floor" upon

which ASC seeks to stand.  While there may be limited evidence to contradict

ASC's evidence related to the majority of its damages claims, the Court cannot

ignore a jury's important role in determining the proven damages.  Such a

determination will certainly take into consideration the documentation provided

to the Court by ASC in support of its motion.  The jury will also be entitled to

examine the credibility of the expert opinions which underpin ASC's calculations

and its assertions of reasonableness.  Of course, in the event that Defendants do

not contest the amount of expenses put forward by ASC at trial, then ASC may

be entitled to move for judgment as a matter of law on the amount of damages

before the case is put to the jury.  See Hyundai Motor Finance Co. v. McKay

Motors I, LLC, 574 F.3d 637, 642 (8th Cir. 2009) (noting that judgment as a matter

of law on the issue of damages is appropriate at trial where damages amount is

truly "uncontested").  At this stage, however, and in light of ASC's own

admission that at least some of its claimed expenses are genuinely disputed, the

Court cannot fix the minimum damages amount as ASC has requested.  The

Court will therefore deny ASC's Motion for Partial Summary Judgment Against

All Defendants on Damages Related to Repair Costs and Expenses.

As a result, the Court need not address Defendants' separate arguments

about their contributory negligence and maritime salvage claims.  Depending on

the facts presented at trial, those claims may allow Defendants to reduce or offset

liability for the damage caused to the McCarthy.

### 3.  Cost of Anti-pollution Efforts

ASC claims that it incurred $132,906.36 in expenses for anti-pollution

efforts and that it is entitled to recover that amount from Defendants.

Defendants argue that ASC lacks standing to claim the expenses from the anti-

pollution efforts because it is not a real party in interest.  Hallett has moved the

Court for summary judgment on this issue.[2]

Rule 17(a) of the Federal Rules of Civil Procedure provides that "[a]n

action must be prosecuted in the name of the real party in interest."  To satisfy

Rule 17(a), a plaintiff must "actually possess, under the substantive law, the right

sought to be enforced."  Curtis Lumber Co., Inc. v. La. Pac. Corp., 618 F.3d 762,

771 (8th Cir. 2010) (quoting United HealthCare Corp. v. Am. Trade Ins. Co., Ltd.,

88 F.3d 563, 569 (8th Cir. 1996)).

The parties agree that, in the absence of an applicable federal maritime

rule, Minnesota law governs whether ASC possesses the right to seek

compensation for the anti-pollution costs.  See Spiller, 466 F.2d at 910 n.9.  Under

Minnesota law,

> [i]f the loss of an insured is fully covered by insurance and the
> insurer has compensated insured for the loss, the insurer is
> subrogated to any rights insured may have had against a third party
> because of the loss.  In such case, the insurer is the real party in
> interest and must bring suit in its own name under the real-party-in-
> interest statute.

Blair v. Espeland, 43 N.W.2d 274, 276 (Minn. 1950).  If, however, the "insured

retains some interest in the cause of action, the suit may be brought in his name."

---

[2] Hallett's other grounds for summary judgment are discussed below.

21

Id.; see also Westendorf v. Stasson, 330 N.W.2d 699, 703 (Minn. 1983) (explaining that, under the full recovery rule, "subrogation will not be allowed where the insured's total recovery is less than the insured's actual loss").

Defendants argue that because a protection and indemnity ("P&I") policy issued by the UK P&I Club reimbursed ASC for all costs associated with anti-pollution efforts, ASC does not possess a right to compensation for those expenses. In response, ASC argues that the anti-pollution costs were a necessary part of the overall recovery effort which ensued after the McCarthy accident. While ASC has been compensated for the anti-pollution expenses, those expenses make up only a small amount of the total expenses incurred as a result of the accident. ASC argues that it cannot be considered to have been "fully compensated" by UK P&I Club and, therefore, it is entitled to seek the full amount of the expenses relating to the repair of the McCarthy, including those arising from anti-pollution efforts.

ASC also argues that the UK P&I Club is not a necessary party under Rule 19. See Braniff Airways, Inc. v. Falkingham, 20 F.R.D. 141, 144 (D. Minn. 1957) ("[While a] partial insurer subrogee is a real party in interest, he is only a proper party, not a necessary party, to a suit brought by the insured to recover the full

loss."). ASC notes that UK P&I Club signed a formal ratification authorizing

ASC to bring the suit and stating that ASC is a real party in interest.

Additionally, ASC argues that Defendants waived their right to raise this

defense by failing to raise it with reasonable promptness. See United HealthCare

Corp., 88 F.3d at 569 ("[A]n objection on real party in interest grounds should be

raised with reasonable promptness in the trial court proceedings. If not raised in

a timely or seasonable fashion, the general rule is that the objection is deemed

waived.") (internal quotations and citations omitted). Plaintiffs point out that

Fraser raised this defense over a year after it discovered the insurance policy and

six months after the deadline for amending pleadings and adding parties had

passed.

The Court agrees that the real party in interest defense is untimely. Fraser

could have raised its objection to the absence of UK P&I Club at a much earlier

date than it did. In any event, the Court also concludes—based on ASC's

incomplete compensation for its total losses and the agreement between ASC and

the UK P&I Club—that ASC is a real party in interest with respect to the

expenses related to anti-pollution efforts. The Court will therefore deny Hallett's

motion for summary judgment on this issue.

### D. ASC's Motion for Partial Summary Judgment against Hallett

ASC argues that undisputed evidence shows Hallett's fault for the McCarthy accident should be presumed because Hallett violated rules related to maritime safety and navigation.[3]  Hallett disagrees, arguing that the ASC should be presumed at fault for the accident.

### 1.  The <u>Oregon</u> Rule and the <u>Pennsylvania</u> Rule

The parties rely on two longstanding admiralty rules—the <u>Oregon</u> Rule and the <u>Pennsylvania</u> Rule.  The <u>Oregon</u> Rule "raises a presumption that a vessel's crew was negligent when a vessel strikes a stationary object."  <u>Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.</u>, 296 F.3d 671, 673 (8th Cir. 2002) (citing <u>The Oregon</u>, 158 U.S. 186, 197 (1895)).  The <u>Pennsylvania</u> Rule is another longstanding admiralty principle, which shifts the burden to a defendant if it failed to comply with statutory safety rules.

> Under the <u>Pennsylvania</u> rule, where any party violates a statutory or regulatory rule designed to prevent collisions, that party has committed per se negligence and that party has the burden of proving that its statutory fault was not a contributing cause of the accident.

---

[3] ASC also argues that Hallett breached its duty as a wharfinger to warn about obstructions in the slip.  This issue is the subject of Hallett's own motion for summary judgment, which contends that Hallett satisfied its wharfinger duties. Both sides of this dispute are discussed below.

Union Pac. R.R. Co., 296 F.3d at 674 (citations and alterations omitted).

Discussing the interplay between these two admiralty rules, the Eleventh Circuit

has summarized:

> [T]he burden of proof initially rests with the moving vessel under
> the Oregon Rule. If the moving vessel can establish the stationary
> vessel violated a statutory rule intended to prevent allisions,
> however, then the Pennsylvania Rule shifts the burden to the
> stationary vessel.

Superior Const. Co., Inc. v. Brock, 445 F.3d 1334, 1340 (11th Cir. 2006).

It its motion for summary judgment, ASC argues that the Pennsylvania

Rule applies in this case because Hallett violated 33 U.S.C. § 403 (the "Rivers and

Harbors Act") and 33 C.F.R. § 64, a regulation passed pursuant to 33 U.S.C. § 409

(the "Wreck Act").  In response, Hallett argues that it did not violate either the

Rivers and Harbor Act or the Wreck Act and the Pennsylvania Rule does not

apply.  Hallett contends that the Oregon Rule should apply instead.

## 1.  Application of the Oregon Rule.

The Oregon Rule "raises a presumption that a vessel's crew was negligent

when a vessel strikes a stationary object such as a bridge." Union Pac. R.R. Co.,

296 F.3d at 673.  The Oregon Rule does not generally apply to allisions with

hidden, sunken, or submerged objects, but it may apply where "knowledge of an

otherwise nonvisible object warrants imposition of presumed negligence against

those operating the vessel who possessed this knowledge." Delta Transload, Inc.

v. M/V Navios Commander, 818 F.2d 445, 450 (5th Cir. 1987). The party invoking

the presumption bears the "burden to prove either visibility or knowledge." Id.

No party in this case contends that the object struck by the McCarthy was visible

or marked. To avail themselves of the Oregon Rule's presumption, Defendants

will therefore need to prove that persons operating the McCarthy knew of

dangerous debris submerged in the slip.

Hallett argues that ASC was aware or should have been aware of the

debris in the south part of the slip and that the Oregon Rule should apply. ASC

notes that the Oregon Rule has only rarely been applied in cases where a ship has

struck a hidden object. ASC further contends that the McCarthy's crew was

unaware of the obstruction in the slip and, because the obstruction was not

marked, the crew had no reason to know of its existence.

The question of what the crew of the McCarthy knew or should have

known is perhaps the most fiercely contested factual issue in this case. Hallett

contends that Gliwa had been informed that there was debris in the slip and that

he should have conveyed that information to the crew of the McCarthy. Hallett

further argues that Captain Smyth could have and should have conducted

soundings of the slip before attempting to dock the McCarthy and that Smyth

did not exercise good judgment when he accepted Whitehead's ill-fated

instruction to back the McCarthy past the first yellow bollard.  For its part, ASC

points to evidence that the McCarthy's crew was not informed about the debris

when they spoke with Hallett personnel in the days before the accident.

The fundamental factual dispute between ASC and Hallett about ASC's

knowledge of the obstruction in the slip precludes the Court's grant of summary

judgment on application of the <u>Oregon</u> Rule.

### 2.  Application of the <u>Pennsylvania</u> Rule.

Regardless of whether the <u>Oregon</u> Rule also applies, if the <u>Pennsylvania</u>

Rule applies, the burden would be shifted to Hallett to prove show that it did not

contribute to the allision.  <u>Superior Const. Co.</u>, 445 F.3d at 1340.  Application of

burden shifting under the <u>Pennsylvania</u> Rule requires the existence of three

elements:

> (1) proof by a preponderance of the evidence of violation of a statute
> or regulation that imposes a mandatory duty; (2) the statute or
> regulation must involve <u>marine safety</u> or navigation; and (3) the
> injury suffered must be of a nature that the statute or regulation was
> intended to prevent.

Union Pac. R.R. Co., 296 F.3d at 674.  The parties agree that the Rivers and

Harbors Act and the Wreck Act both concern marine safety and navigation and

are also intended to prevent accidents like the one at issue in this case.  The

parties dispute whether either Act applied in this case, imposing on Hallett a

mandatory duty which it then violated.

### a.  "Navigable Waters" Under the Rivers and Harbors Act and the Wreck Act

The Rivers and Harbors Act and the Wreck Act both apply to the

"navigable waters" of the United States.  Under 33 C.F.R. § 2.36(a), navigable

waters include "[i]nternal waters of the United States . . . that . . . [a]re or have

been used, or are or have been susceptible for use, by themselves or in

connection with other waters, as highways for substantial interstate or foreign

commerce."  The Eighth Circuit has similarly held that, for a body of water to be

"navigable" under the Rivers and Harbors Act, it "must be navigable in fact

[and] it must itself, or together with other waters, form a highway over which

commerce may be carried on with other states."  Minnehaha Creek Watershed

Dist. v. Hoffman, 597 F.2d 617, 623 (8th Cir. 1979).  ASC argues that the water in

the slip alongside Dock No. 8 is "navigable."  Hallett disagrees.

ASC contends that the slip is navigable because it was in regular use by commercial vessels in interstate commerce.  It is undisputed that ships unloaded commodities at the dock thirty-two times between October 2006 and January 2008.  (See First Alcazar Decl., Ex. 25.)  ASC also notes that McCoshen, the President of Hallett, agreed that "Duluth harbor and the docks owned by Hallett" are "navigable waters" meaning that they serve "large ships that are in the business of shipping from state to state or international[ly]."  (McCoshen Dep., First Alcazar Decl., Ex. 3 at 264:2-12.)  Hallett's own expert, John Olthuis, further agreed that "the slip[s] in [Dock Nos.] 5 and 8" were navigable.  (Olthuis Dep., First Alcazar Decl., Ex. 22 at 160:23-161:12.)  No expert has offered a contrary view.

Hallett argues that the various witnesses were not asked to opine specifically whether the slip was "navigable" under the Rivers and Harbors Act or the Wreck Act.  Hallett notes that the term "navigable waters" is susceptible to different meanings depending on context.  As the Eighth Circuit has explained:

> [The Supreme Court has] identified four separate purposes underlying definitions of "navigability":  to delimit the boundaries of the navigational servitude; to define the scope of Congress' regulatory authority under the commerce clause; to determine the extent of the authority of the Corps of Engineers under the Rivers and Harbors Act of 1899; and to establish the limits of federal

admiralty jurisdiction.  Each of these areas of the law might well
require a different definition of "navigability."

Livingston v. United States, 627 F.2d 165, 169 (8th Cir. 1980); see Kaiser Aetna v.

United States, 444 U.S. 164, 176 (1979).  In Hallett's view, in light of the different

definitions of navigability, the various opinions by witnesses in this case that the

slip is generally "navigable" does not resolve the question of whether it is

specifically "navigable" for the purposes of the Rivers and Harbors Act or the

Wreck Act.

Hallett further argues that several factual details indicate that the slip

should not be considered "navigable waters."  First, the slip was originally a

marshland which was later dredged out.  Second, the slip is not open to the

public but rather is private and open only to ships invited by Hallett.  Hallett has

not, however, cited to cases supporting its assertion that these factors influence

the "navigable" character of a slip under the Rivers and Harbors Act or the

Wreck Act.  As ASC notes, manmade waterways must be susceptible to a

"navigable" characterization.  Otherwise, parts of major waterways such as the

St. Lawrence Seaway would not meet the definition.  As for the contention that

the slip should not be considered navigable because it is private, the Fifth Circuit

has rejected that reasoning, concluding that "the characterization of [a waterway]

as 'public' or 'private' is irrelevant" when determining whether that waterway is "navigable" under the Rivers and Harbors Act.  <u>Dow Chem. Co. v. Dixie Carriers, Inc.</u>, 463 F.2d 120, 123 (5th Cir. 1972).

In light of the use and physical characteristics of the slip alongside Dock No. 8, there is little doubt that it forms part of "a highway over which commerce may be carried on with other states."  <u>Minnehaha Creek Watershed Dist.</u>, 597 F.2d at 623.  The Court therefore concludes that the slip meets the definition of "navigable waters" under the statutes and regulations relevant here.

### b.  Violation of the Rivers and Harbors Act

In its entirety, § 403 of the Rivers and Harbors Act provides:

> The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403.

The Court must first address Hallett's argument that § 403 applies exclusively to the intentional or purposeful creation of obstructions.  As Hallett has belatedly noted,[4] some Courts have opined that a "negligent creation of an obstruction to navigation does not violate § 403."  United States v. W. Indies Transp., Inc., 127 F.3d 299, 310 (3d Cir. 1997) (emphasis added); see United States v. Bigan, 274 F.2d 729, 732 (3d Cir. 1960).  Other courts have come to the opposite conclusion.  See, e.g., United States v. Cargill, Inc., 367 F.2d 971, 977-78 (5th Cir. 1966).

Many of the cases creating the Circuit split discussed above involve negligently sunken vessels, not structures like the one at issue here.  This distinction is important because separate sections of the Rivers and Harbors Act pertain to "vessels," "craft," and "boat[s]."  See 33 U.S.C. §§ 409, 412.  Some courts have therefore concluded that § 403 should not be read to include sunken vessels specifically covered elsewhere in the Act.  See, e.g., United States v. Ohio Barge Lines, Inc., 607 F.2d 624, 629-30 (3d Cir. 1979) ("Interpreting [§ 403] to

---

[4] Hallett failed to raise this argument in its opposition to ASC's motion for summary judgment.  Instead, it did so in its reply brief to ASC's opposition to Hallett's motion for summary judgment.

impose liability for the unintentional sinking of a <u>vessel</u> would create the anomaly of imposing criminal sanctions under a general provision of a statute on an activity which is not prohibited by the section of the statute specifically addressing the problem.") (emphasis added).  This case, in contrast, involves the alleged negligent sinking of debris which, until it fell into the slip, was located on land.  Such objects are not vessels.  <u>See</u> 1 U.S.C. § 3 (defining a "vessel" as a "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water").

Other opinions concluding that negligently created obstructions were not covered by § 403 were addressed specifically to the <u>second</u> clause of § 403, which prohibits the "the <u>building</u> of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" in navigable waters without permission.   33 U.S.C. § 403 (emphasis added).  Obviously, the second clause in § 403 is more specific than its first, which prohibits the creation of "any obstructions," and a court interpreting the more specific language is likely to conclude that a party which negligently created an obstruction cannot be said to have "built" the obstruction.  <u>See</u> <u>W. Indies Transp., Inc.</u>, 127 F.3d at 310; <u>Bigan</u>, 274 F.2d at 732.  The accusation in this case is that Hallett violated the <u>first clause</u> of § 403—the

33

general prohibition on the "creation of any obstructions."  The Court concludes

that this clause, in the very least, encompasses the negligent creation of a non-

vessel obstruction.

Next the Court must consider whether the concrete and rebar debris in the

slip constitutes an "obstruction."  Though § 403 does not itself provide a

definition of "obstruction," the Supreme Court has held that the term is

expansive—"broad enough to include diminution of the navigable capacity of a

water by a means <u>not included in the second or third clauses</u> [of § 403]."  <u>United</u>

<u>States v. Republic Steel Corp.</u>, 362 U.S. 482, 486-87 (1960) (emphasis added).  The

term "obstruction" has elsewhere been defined as "anything that restricts,

endangers, or interferes with navigation."  33 C.F.R. § 64.06.

ASC contends that there is no dispute that the debris which fell into the

slip when the part of Dock No. 8 collapsed constitutes an obstruction.  Hallett

CEO, Jerry Fryberger, answered "Yes" when asked whether "the concrete

mooring house and the concrete and rebar obstruction presented a hazard to

navigation in the slip."  (Fryberger Dep., First Alcazar Decl., Ex. 1 at 119:25-

120:11.)  The other experts in this case have each confirmed that the debris in the

slip was a "dangerous obstruction" (Libby Dep., First Alcazar Decl., Ex. 24 at

156:3-5.), a "hazard to navigation" (Dudley Dep., First Alcazar Decl., Ex. 23 at 188:3.), and "dangerous to [a] ship" (Olthuis Dep. at 147:15-18).  Hallett responds that none of the experts stated that they defined "obstruction" in a manner applicable to the statute.  Hallett further argues that it was not in violation of § 403 because it had begun to clean up the debris with the permission of the Army Corps of Engineers.

While it is true that none of the experts applied a particular definition of "obstruction," their statements that the debris was hazardous and dangerous clearly satisfy the broad definition of that term.  Moreover, Hallett has not explained how its clean-up efforts, which were admittedly incomplete at the time of the accident, lead to the conclusion that it was not in violation of § 403.

Because Hallet was responsible for the debris in the slip, the slip was "navigable water," and the debris constituted an "obstruction," the Court concludes that Hallett violated 33 U.S.C. § 403.

### c.  Violation of the Wreck Act

ASC further argues that Hallett violated regulations implementing the Wreck Act.  Under 33 C.F.R. § 64.11(a),

> [t]he owner of a vessel, raft, or other craft wrecked and sunk in a navigable channel shall mark it immediately with a buoy or daymark during the day and with a light at night.  The owner of a

sunken vessel, raft, or other obstruction that otherwise constitutes a
hazard to navigation shall mark it in accordance with this
subchapter.

This regulation requires owners of submerged obstructions to act with

"reasonable care under existing circumstances" in marking such obstructions.

Targa Midstream Servs. Ltd. P'ship v. K-Sea Transp. Partners, L.P., 527 F. Supp.

2d 598, 603 (S.D. Tex. 2007) (citing Nunley v. M/V Dauntless Colocotronis, 527

F.2d 455 (5th Cir. 1984)).

ASC argues that undisputed facts show that Hallett failed to mark the area

containing debris in the southern portion of the slip.  In support, ASC notes that

Hallett CEO Fryberger has admitted that Hallett did not put up a sign to warn

ships of the debris in the slip.  (Fryberger Dep. 139:7-18.)  It further points to

statements by Hallett President McCoshen that "that there was nothing

preventing [Hallett] from placing a sign on the dock" and that "warning signs

are good practice" but that Hallett had not considered placing a sign on the dock.

(McCoshen Dep. 172:11-15; 252:15-16.)

Hallett responds that it exercised reasonable care in warning ASC about

the debris in the slip.  First Hallett notes that while it had initially marked the

area around the debris with buoys, doing so in winter would have been

ineffective because the harbor generally freezes over with two to three feet of ice.

(McCoshen Aff. ¶¶ 3-5.)   While Hallett does not dispute the fact that it did not

place signs, daymarks, or lights warning of the debris on the dock, it argues that

it exercised reasonable care by notifying ASC employees that the McCarthy

should not pass beyond the first yellow bollard.

While Hallett's alleged statements to ASC may help it rebut a presumption

of its contribution to the McCarthy accident, the question here is whether Hallett

complied with the Wreck Act.  The Wreck Act specifically requires the owner of

a submerged obstruction to "mark" the area of an obstruction, and there is no

dispute that the area was not marked in any way on the day the of the McCarthy

accident.  A reasonable juror could not conclude that Hallett's complete failure to

mark the debris was reasonably in compliance with a regulation requiring it to

do just that.

For these reasons, the undisputed evidence indicates that Hallett violated

both the Rivers and Harbors Act and Wreck Act by creating an underwater

obstruction and failing to mark that obstruction in any way on the day of the

holing and sinking of the McCarthy.  Under the <u>Pennsylvania</u> Rule, these

violations create a rebuttable presumption that Hallett's negligence contributed to the holing and sinking of the McCarthy.

Although ASC is entitled to this presumption, Hallett will be afforded an opportunity to rebut that presumption by showing that another party was solely responsible for the accident, see Alter Barge Line, Inc. v. TPC Transp. Co., 801 F.2d 1026, 1029 (8th Cir. 1986), or showing that the violation of statute "could not have contributed to the collision," Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159, 162 (4th Cir. 1984); see 2 Shoenbaum, supra, § 14-3.

Hallett argues that ASC and the McCarthy's crew were aware or should have been aware of "a specific do not pass point and/or the debris in the slip." In particular, Hallett points to Gliwa's statement that Hallett representatives had told him that the McCarthy should not proceed past the first yellow bollard because there was debris in the southern end of the slip. This evidence might indicate that the accident was caused by ASC's negligence, not by Hallett's statutory violations. Hallett also argues that markers around the debris may not have stopped the accident. Adjudication of such claims would require the resolution of basic factual disputes, which is not appropriate at summary judgment.

The Court concludes that the initial presumption against Hallett under the

Pennsylvania Rule is supported by undisputed evidence of violations of the

Rivers and Harbors Act and the Wreck Act, but that genuine issues of material

fact remain as to whether that presumption can be rebutted.  The Court will

therefore grant ASC's motion for summary judgment in part, ruling that the

Pennsylvania Rule's presumption applies to Hallett's conduct.

### D.  Hallett's Motion for Partial Summary Judgment

Hallett and ASC both seek summary judgment on whether Hallett

breached its duties as a wharfinger.  Hallett also seeks summary judgment on the

viability of ASC's implied warranty claims (Counts III and IV).  Hallett's request

for summary judgment on ASC's claim for damages related to anti-pollution

efforts has already been discussed above.

### 1.  Duties of a Wharfinger

Both ASC and Hallett have moved for summary judgment asking this

court to rule whether Hallett satisfied its duties as a wharfinger.  The Supreme

Court explained those duties in Smith v. Burnett, 173 U.S. 430, 433 (1899):

> Although a wharfinger does not guaranty the safety of vessels coming to
> his wharves, he is bound to exercise reasonable diligence in ascertaining
> the condition of the berths thereat, and, if there is any dangerous
> obstruction, to remove it, or to give due notice of its existence to vessels

about to use the berths.  At the same time, the master is bound to use ordinary care, and cannot carelessly run into danger.

A wharfinger is not generally responsible for dangers "reasonably known to the shipowner."  See Trade Banner Line, Inc. v. Caribbean S.S. Co., S.A., 521 F.2d 229, 230 (5th Cir. 1975).

The parties dispute whether the area of the slip containing the debris was part of the berthing area offered by Hallett to ASC.  The parties also disagree about a wharfinger's duty to warn about obstructions outside of the berthing area.  They further contest whether undisputed evidence indicates that Hallett satisfied its duties, even assuming that the debris was within the berthing area.

### a.  The Berthing Area

Hallett argues that it had no duty to warn ASC about the debris in the southern end of the slip because that part of the slip was not part of the designated berthing area.  In Hallett's view, the berthing area included only the portion of the slip north of the first yellow bollard.  ASC asserts that the designated berthing area extended to the area containing the debris.

There is evidence supporting both parties' assertions:  Hallett's witnesses state that they made clear to ASC employees that the McCarthy was not to proceed past the first yellow bollard.  On the other hand, it is undisputed that

40

there were no warning signs or buoys marking the end of the safe berthing area

and that the dock continued on for hundreds of feet to the shore.  ASC has also

submitted evidence indicating that Hallett employees told the McCarthy's crew

members that the slip had "good water" in areas further south than the spot

where the McCarthy was grounded and that the McCarthy should be docked as

far south in the slip as possible.

To rule that the berthing area at Dock No. 8 extended only to the first

yellow bollard would be to resolve one of the main factual disputes in this case:

Had Hallett made clear to ASC that the McCarthy was not to proceed past the

first yellow bollard because of the existence of dangerous debris past that point?

Because the Court cannot resolve this fact-bound issue at summary judgment, it

cannot rule in favor of either party on the question of whether Hallett satisfied its

duty as a wharfinger.

### b. Duties outside of the Berthing Area

The parties also dispute the related question of whether a wharfinger has a

duty to warn about dangers near to, but not within, a berthing area.  The Fifth

Circuit has held that "there is no duty on the part of a wharfinger to provide a

berth with safe surroundings (other than an entrance and exit) or to warn that

hazards exist in its vicinity."  Trade Banner Line, Inc., 521 F.2d at 230.  As ASC

points out, however, <u>Trade Banner Line</u> concerned facts quite different from those at issue here.  <u>See</u> <u>Trade & Transp., Inc. v. Caribbean S. S. Co., S.A.</u>, 384 F. Supp. 782, 786 (S.D. Tex. 1974).  Other courts facing more analogous situations have concluded that wharfingers have duties which extend beyond the narrow confines of the berthing area.  In <u>Sonat Marine Inc. v. Belcher Oil Co.</u>, 629 F. Supp. 1319, 1326 (D.N.J. 1985), for example, the Court held that a wharfinger had a duty to know of and warn about an obstruction adjacent to a berthing area, where it was "highly likely" that a ship might strike the obstruction when accessing the berth.

As discussed above, the facts proven at trial may indicate that the debris struck by the McCarthy was within the designated berthing area, rendering the question of Hallett's duties outside that area moot.  Since the Court must deny summary judgment as to the question of Hallett's wharfinger's duties for the reasons already discussed, the Court need not resolve this legal issue at this stage.

### c. Hallett's Satisfaction of its Duties

Hallett has argued in the alternative that, even if the debris had been in the berthing area, Hallett was under no duty to warn the McCarthy about the debris directly because Hallett had already warned Gliwa in the January 10 meeting.

42

Once again, what Hallett told Gliwa is a contested factual issue, and there were

subsequent conversations between Hallett and members of the McCarthy crew in

which Hallett allegedly stated that the slip was free of obstructions.  For all of the

above reasons, there remain genuine issues of material fact as to Hallett's

performance of its duties as a wharfinger, and a grant of summary judgment on

this issue would be premature.

### 2.  Counts III & IV—Implied Warranty Claims

#### a.  Implied Warranty of Workmanlike Performance

Hallett argues that the ASC's claim for breach an implied warranty of

workmanlike performance ("WWLP") must be dismissed because such claims

are not recognized in maritime law.  Hallett argues that such claims are

recognized.

The WWLP was introduced into federal maritime law from common

contract law in <u>Ryan Stevedoring Co. v. Pan-Atl. S.S. Corp.</u>, 350 U.S. 124 (1956).

<u>See</u> 1 Shoenbaum, <u>supra</u>, § 5-9.  In <u>Ryan</u>, a vessel owner was liable for personal

injuries suffered by a stevedore working on the vessel.  The Supreme Court

concluded that the vessel owner could recover from the stevedore's employer on

a theory of indemnity where the company was responsible for the unseaworthy

conditions which led to the stevedore's injuries.  <u>Id.</u>  After <u>Ryan</u>, courts began to

43

apply the WWLP to a variety of maritime contexts, even after the direct holding

of <u>Ryan</u> was legislatively abrogated by 1972 amendments to the Longshoreman

and Harbor Worker's Compensation Act.  <u>See</u> <u>Ducrepont v. Baton Rouge Marine</u>

<u>Enters., Inc.</u>, 666 F. Supp. 882, 884 -885 (E.D. La. 1987).  As a result, the WWLP

"lives on as one of the ambiguous and controversial concepts in all of admiralty

law."  1 Shoenbaum, <u>supra</u>, § 5-9.

        The WWLP has come to take on different meanings.  <u>See</u> <u>id.</u>  It is often

used as a basis for establishing a party's liability for a maritime damages.  <u>See,</u>

<u>e.g.</u>, <u>N. Ins. Co. of N.Y. v. Point Judith Marina, LLC</u>, 579 F.3d 61, 67 (1st Cir.

2009).  In this context, a contractor providing a maritime service has a duty to

perform its work in a "diligent and workmanlike manner."  <u>Id.</u>  This requirement

is "analogous to a duty of care in tort" and, "[u]nlike the implied warranties of

the U.C.C.," it "necessarily parallel[s] a negligence standard rather than

imposing strict liability."  <u>Emp'rs Ins. of Wausau v. Suwannee River Spa Lines,</u>

<u>Inc.</u>, 866 F.2d 752, 763 (5th Cir. 1989); <u>see</u> 1 Shoebaum, <u>supra</u>, § 5-8.

        In other contexts, WWLP might also serve as a basis for indemnification—

fully shifting one party's liability to another.  Courts have made clear, however,

that "the factors to be considered in determining whether a contract includes a

warranty of workmanlike performance are entirely separate from the factors that

go into the determination of whether that warranty encompasses an obligation to

indemnify." Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc., 511 F.2d

1252, 1259 (2d Cir. 1975).  There has been much reluctance to expand this

indemnification theory beyond the personal injury context at issue in Ryan.  See,

e.g., Phillips Petroleum Co. v. Stokes Oil Co., 863 F.2d 1250, 1255 (6th Cir. 1988);

Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co., 651 F.2d 1096, 1099

(5th Cir. 1981).

    In light of the above discussion, to the extent that ASC's WWLP claim is an

assertion that the contract between ASC and Hallett may have given rise to

duties on Hallett to perform its obligations in a diligent manner, that claim

survives.  There is no basis for a Ryan indemnification claim here, however,

because this case involves property damage rather than personal injury.

Damages proven in this case will be divided among the liable parties in

proportion to each party's fault.  See e.g., Agrico Chem. Co. v. M/V Ben W.

Martin, 664 F.2d 85, 93-94 (5th Cir. 1981).  As other Courts have concluded in

similar cases, ASC's claims "are best accommodated by a straightforward

application of the usual maritime comparative fault system."  Phillips, 863 F.2d

at 1253 (quoting <u>Gator Marine Serv. Towing, Inc.</u>, 651 F.2d at 1100).  The Court

will deny Hallett's motion to dismiss Count III, but ASC should abandon any

hope of pursuing a theory of <u>Ryan</u> indemnity or strict liability.

### b.  Implied Warranty of Fitness for a Particular Purpose

ASC grounds this implied warranty claim in Uniform Commercial Code

("UCC") § 2-315.  <u>See</u> Minn. Stat. § 336.2-315.  The Court concludes that § 2-315

cannot apply here.  As ASC notes, § 2-315 applies to "goods."  <u>See</u> Minn. Stat. §§

336.2-102, 2-315.  "Goods" are "all things (including specially manufactured

goods) which are movable at the time of identification to the contract for sale

other than the money in which the price is to be paid, investment securities

(article 8) and things in action."  Minn. Stat. § 336.2-105.  ASC asserts that Dock

No. 8 is a "good."  ASC has not, however, cited to a single case holding that such

a structure can be so characterized.  Dock No. 8 consists of a 2,200-2,300 foot long

slip and a permanent concrete and metal pier that runs alongside it.  The Court

fails to see how the slip or pier is "movable" in any sense.  ASC's claim against

Hallett based on an implied warranty of fitness for a particular purpose must be

dismissed.

### E.  Fraser's Motion for Summary Judgment

Fraser has moved for summary judgment on all counts of ASC's

complaint.  In response, ASC concedes that Count IV (breach of implied

warranty of fitness for a particular purpose) should be dismissed.  ASC argues

that <u>it</u> should be entitled to summary judgment against Fraser on Count I

(negligence) and that there exist genuine issues of material fact as to the

remaining counts.

### 1.  Count 1—Negligence

A claim for negligence in maritime law, as in other contexts, requires a

showing that the defendant breached a duty of care owed to the plaintiff, that the

plaintiff suffered damages, and that the defendant's breach was the proximate

cause of those damages.  <u>See, e.g.</u>, <u>Consol. Aluminum Corp. v. C.F. Bean Corp.</u>,

833 F.2d 65 (5th Cir. 1987).

### a.  Duty

Fraser argues that because it was not wharfinger, it did not owe ASC a

general duty to act with ordinary care and diligence to provide a safe berth for

the McCarthy.  ASC does not contend that Fraser was a wharfinger.  ASC instead

argues that Fraser owed it a duty of care because it had agreed to help guide and

spot the McCarthy and because one of Fraser's employees, Whitehead, guided

47

the McCarthy backward past the first yellow bollard, despite having been told

that the McCarthy should not proceed past that point.  In short, ASC argues that

Fraser "had a duty to conform to a particular standard of conduct which . . .

meant adhering to the docking instructions and making sure that the McCarthy

was not exposed to potential danger."

Fraser denies that it had any such duty.  It contends that it never agreed to

assume Hallett's responsibilities as wharfinger and that it was merely a business

invitee on the dock with the narrow duties of tying the McCarthy to the dock and

performing other services once the ship's crew brought it to a location of their

choosing.  Fraser points to the Service Purchase Orders ("SPOs") that ASC sent to

Fraser, which specified that Fraser was to handle line and anchor handling,

provide gangway access, and assist in connecting the ship to onshore electricity.

These duties, it contends, did not extend to spotting or guiding the McCarthy or

otherwise ensuring that the McCarthy was safely berthed at Dock No. 8.

In response, ASC argues that it had been Fraser's practice to "spot, guide,

and tie-up" ASC's ships when they berthed at Hallett docks.  It notes

Whitehead's testimony that it was his practice to consult with a Hallett

representative about where the vessel should be located at the dock before the

day of docking.  (Whitehead Dep. at 210:4-211:16.)  ASC further notes that, with

respect to the docking of the McCarthy, Whitehead had been told by fellow

Fraser employee Mike Peterson to "get with [CJS employee] Mike Podgorak

about the instructions for docking the vessel."  (Whitehead Dep. 309:10-12.)  The

testimony of Hallet President McCoshen further corroborates ASC's position;

when asked whether he understood that "Fraser was going to guide and spot the

McCarthy," McCoshen answered, "Absolutely."  (McCoshen Dep. at 90:2-6)

Moreover, viewing the evidence in ASC's favor, Whitehead's alleged

actions on the day of the docking are not consistent with Hallett's contention that

it had not endeavored to help spot and guide the McCarthy.  Whitehead has

stated that he told Podgorak that he was going to "back [the McCarthy] as far as

[he] could get it between the forward cleat and the ladder" which he had

previously placed on the dock.  (Whitehead Statement, First Alcazar Decl., Ex.

26.)  Whitehead has also stated that he told the crew of the McCarthy that the

"further [they could back up the McCarthy] the better so that we could access the

McCarthy for repairs requiring a crane" and that if he "had been informed there

was something back there [he] would never have backed the McCarthy up."

(Id.)  While Whitehead has denied that he was acting as a "spotter," the

McCarthy's crew has stated that they were following Whitehead's instructions when they backed the McCarthy past the first yellow bollard.   (Smyth Statement, Second Alcazar Decl., Ex. 5.)  Further, Reuben Johnson employee David Shepersky has stated that when he arrived at Dock No. 8 after the holing of the McCarthy, Whitehead told him that he was "the one that decided to bring the boat back further" south into the slip.  (Shepersky Statement, Second Alcazar Decl., Ex. 7.)

Fraser asserts that Whitehead wanted to know where the McCarthy would be docked only so that Fraser could be prepared to do the tasks set out in the SPOs and that Fraser never undertook guiding or spotting responsibilities.  The various conflicting statements create a genuine factual dispute as to whether Fraser had assumed a role beyond merely performing services on the McCarthy after it had come to stop.  If Fraser had assumed a role guiding the McCarthy, then it would have owed ASC a duty to do so with a reasonable standard of care, whether or not it was the wharfinger.[5]

---

[5] Fraser has also argued that it did not owe ASC a duty to warn because ASC was already aware of the debris in the slip.  This argument mischaracterizes the duty asserted by ASC, and it is also undermined by many factual disputes over just what ASC knew about the debris in the slip prior to the accident.

## b.  Foreseeability

Fraser argues that it cannot be held liable because the holing of the

McCarthy was unforeseeable.  It argues that it and ASC had the same level of

knowledge about the debris in the slip because Whitehead and Gliwa were at the

same meeting.  ASC argues that even if Fraser had no knowledge about the

debris in the slip, the accident was still foreseeable because it is always

foreseeable that a vessel may be damaged if it is "brought beyond the designated

docking location."  In this instance, ASC notes that Fraser was particularly aware

of the potential for damage because it was aware that Dock No. 8 could "silt-in"

or fill with silt, reducing the amount of water available for docking.  Given the

factual disputes that persist in this case, the Court cannot make a ruling on the

foreseeability of the McCarthy accident at this time.

## c.  Causation

In maritime law, as in general tort law, "a party's negligence is actionable

only if it is the legal cause of the plaintiff's injuries, which is something more

than but for causation—the negligence must be a substantial factor in causing the

injuries."  In re Great Lakes Dredge & Dock Co. LLC, 624 F.3d 201, 213-214 (5th

Cir. 2010) (citations, alterations, and quotations omitted); see 1 Shoenbaum,

supra, § 5-3.  Fraser argues that Hallett's failure to warn of an obstruction was

51

the "substantial factor" in causing the McCarthy accident and that any additional

breach on Fraser's part could not also have been a substantial factor.

Clearly, however, more than one factor may be a substantial factor in

causing a plaintiff's injury.  See, e.g., Osborne v. Twin Town Bowl, Inc., 749

N.W.2d 367, 376 (Minn. 2008).  Viewing the facts in the light most favorable to

ASC, Fraser's direction of the McCarthy past the first yellow bollard and

Hallett's failure to warn the McCarthy about the debris in the southern part of

the slip may have both constituted substantial causal factors leading to the

accident.  Of course, viewing the evidence in the light most favorable to Fraser

and Hallett, ASC's own negligence may have been the sole substantial factor in

the accident.  Such determinations are for the jury to make at trial.

For the foregoing reasons, the Court will deny Fraser and ASC's motions

for summary judgment on the negligence claim.

## 2.  Count II—Breach of Contract

Fraser next contends that summary judgment should be granted in its

favor on ASC's breach of contract claim.  Fraser argues that the SPOs between it

and ASC obligated it only to provide "line and anchor handling," which it

contends does not include "guiding" or "spotting" services.  Fraser argues that

the term "line and anchor handling" is unambiguous and, therefore, extrinsic

evidence should not be consulted to determine its meaning.  See, e.g., Town Bank

v. City Real Estate Dev., LLC, 793 N.W.2d 476, 484 (Wis. 2010) ("Only when the

contract is ambiguous, meaning it is susceptible to more than one reasonable

interpretation, may the court look beyond the face of the contract and consider

extrinsic evidence to resolve the parties' intent.").

ASC argues that the term "line and anchor handling" is ambiguous and,

therefore, evidence of "custom and usage" should be examined to determine the

meaning of the contract.  See Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp., 130 S.

Ct. 1758, 1769 n.6 (2010) ("Under . . . general maritime law, evidence of 'custom

and usage' is relevant to determining the parties' intent when an express

agreement is ambiguous.").  ASC contends that both parties understood the term

to include spotting services.  In support, ASC notes that Fraser has performed

spotting services for ASC vessels in the past when only "line and anchor

handling" was requested.  (Gliwa Aff. ¶ 4; McCoshen Dep. 97:23-98:2.)

The question of whether a contract is ambiguous is a question of law for

the Court, but construction of an ambiguous contract becomes a fact question for

the jury.  See, e.g., Thomsen v. Famous Dave's of Am., Inc., 606 F.3d 905, 908 (8th

Cir. 2010).  A contract is ambiguous when "it is reasonably susceptible of more than one interpretation."  Id.  Here the Court concludes that the term "line and anchor handling" without further definition or explanation is sufficiently ambiguous to allow resort to extrinsic evidence to understand the bounds of the parties' agreement.

ASC argues in the alternative that, if the Court were to conclude that the term "line and anchor handling" were not ambiguous and did not include spotting services, Fraser's conduct nonetheless changed the terms of the contract, obligating Fraser to spot and guide the McCarthy.  See Mitchell v. Rende, 30 N.W.2d 27 (Minn. 1947) ("The law is well settled that assent to an offer to modify, to rescind, or to alter a written contract may be evinced by the conduct and acts of the offeree as well as by express verbal agreement."); see also Cousineau v. Norstan, Inc., 322 F.3d 493, 496-497, 322 F.3d 493 (8th Cir. 2003) ("[W]hether particular facts amount to modification of a contract is a question of law, while whether such facts are proved is a question of fact.")

ASC contends that Fraser's decision to send Podgorak to the January 10 meeting on its behalf, as well as Whitehead's actions upon the McCarthy's arrival at Dock No. 8 sufficiently demonstrate Fraser's intention to take on spotting

responsibilities in addition to merely tying the McCarthy to the dock.

Whitehead's alleged actions—meeting with Podgorak to learn where to "park"

the boat and instructing the McCarthy to proceed further south into the slip—do

indicate that he, a Fraser employee, accepted spotting responsibilities.  Thus, the

facts viewed in the light most favorable to ASC give rise to an inference of

modification.

For the foregoing reasons, the Court will deny summary judgment as to

ASC's breach of contract claims.

### 3.  Count III—Implied Warranty of Workmanlike Performance

As discussed above, in maritime law, as in other areas of the law, a party

that "contracts to provide services impliedly agrees to perform in a diligent and

workmanlike manner."  N. Ins. Co. of N.Y., 579 F.3d at 67.  Thus, ASC's claim for

breach of the implied warranty of workmanlike performance (WWLP) is

predicated on the existence of a contract between it and Fraser for spotting

services.  See id. at 68 ("Though the implied warranty of workmanlike

performance is a legal standard, the question of what is required in a

workmanlike performance is necessarily a factual question that naturally varies .

. . based on the scope and nature of the service being undertaken.").  Because

ASC's breach of contract claim survives summary judgment, this claim must also

survive.

In its reply brief, Fraser argues that even if a breach of an implied warranty

occurred, it cannot be held liable under a principle of law explained by the

Seventh Circuit:

> It is the law that a plaintiff may not recover for breach of express or
> implied warranty where the facts proven show that there are several
> possible causes of an injury, for one or more of which the defendant was
> not responsible and it is just as reasonable and probable that the injury was
> the result of one cause or the other.

Royal Bus. Machines, Inc. v. Lorraine Corp., 633 F.2d 34, 46 (7th Cir. 1980)

(citations and alterations omitted).  While it is not altogether clear that this rule of

law applies to this case, if it did, it would be premature for the Court to rule that

any "facts proven" have shown that there were multiple causes of the injury or

that it was "just as reasonable and probable" that the holing of the McCarthy was

the result of other parties' negligence.  See id.  In any event, as the Court has

already explained, a potential WWLP in this case is not a source of

indemnification or strict liability.  Rather, any WWLP establishes only duties

owed by one party to another.  Thus, even if Fraser is found to have breached an

implied warranty of workmanlike performance, damages will still be

apportioned between the responsible parties based upon their relative fault for the accident.

### 4. Count V—Breach of Express Warranties

Fraser argues that it made no express warranties to ASC which might have been breached in the McCarthy accident.  In support of its claim, ASC points to the Service Purchase Orders ("SPOs") that ASC sent to Fraser, which stated: "Unless instructions given in this order (both written or printed) are followed strictly, we will hold you responsible for any errors or delays which may occur." (First Alcazar Decl., Ex. 7.)  ASC argues that, by agreeing to this clause, Fraser expressly warranted against all "errors" in the performance of its duties.  It argues that Fraser breached this warranty by failing to follow docking instructions and guiding the McCarthy into debris in the slip.  Fraser argues that the plain language of the SPOs does not reveal an express warranty by Fraser that the McCarthy would be safely docked.

An express warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely."  Dittman v. Nagel, 168 N.W.2d 190, 193 (Wis. 1969).  The Court cannot conclude that the language in ASC's SPOs amounted to an express warranty by Fraser.  The language of the

SPOs—"we will hold you responsible for any error or delays"—is simply not a

promise from Fraser to ASC.  If anything, this language relates to the actions that

ASC will take should Fraser commit an "error."  Because this language is the sole

basis for ASC's express warranty claim, the Court will grant summary judgment

in favor of Fraser on that claim.

### 5.  Count VI—Negligent Misrepresentation

An individual or entity commits the tort of negligent misrepresentation

when,

> in the course of his business, profession or employment, or in any
> other transaction in which he has a pecuniary interest, supplies false
> information for the guidance of others in their business transactions,
> is subject to liability for pecuniary loss caused to them by their
> justifiable reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or communicating the
> information.

First Presbyterian Church of Mankato v. John G. Kinnard & Co., 881 F. Supp. 441,

446 (citations omitted) (D. Minn. 1995).

In its complaint, ASC claims that Fraser made representations that Dock

No. 8 was safe for berthing.  There does not appear to be support for those

allegations, as there is no evidence that Fraser employees told ASC anything

about the conditions at Dock No. 8 in the lead up to the McCarthy accident.

Those allegations, therefore, cannot support a negligent representation claim.

ASC has also claimed, however, that Fraser also provided false

information when Podgorak, acting as Fraser's representative, stated that he

would be present for the arrival of the McCarthy and when Fraser indicated that

it would spot and guide the McCarthy.  With respect to those allegations, as

discussed above, there do appear to be genuine questions of material fact as to

whether Fraser made such representations, whether ASC's reliance on those

representations was justifiable, and whether ASC suffered a loss as a result of

that reliance.  The Court will therefore decline to grant Fraser's motion for

summary judgment as to this claim.

### 6.  Presumption of Fault

Fraser finally argues that ASC should be presumed at fault for the

McCarthy accident under the <u>Oregon</u> Rule.  The Court has already concluded

that it cannot rule on the application of the <u>Oregon</u> Rule at this stage.

### G. Chris Jensen & Son's Motion for Partial Judgment

Defendant Chris Jenson & Son Co., Inc. ("CJS") has moved for summary

judgment as to four of the six counts directed at it.  ASC has conceded that two of

those counts—Count IV (breach of implied warranty of fitness for a particular

59

purpose) and Count V (breach of an implied warranty)—should be dismissed.

The remaining two counts—Count II (breach of contract) and Count III (breach of

implied warranty of workmanlike performance)—remain in dispute.

### 1. Count II—Breach of Contract

CJS argues that ASC's breach of contract claim cannot succeed because the

undisputed facts show that no contract was formed between CJS and ASC. The

parties agree that maritime law applies to any contract regarding the docking of

the McCarthy, and where a federal court considers a breach of contract claim in

the maritime context, it recognizes the prevailing state law. See, e.g.,

Constructive Hands, Inc. v. Baker, 446 F. Supp. 2d 88, 93 (N.D.N.Y. 2006). While

the parties dispute whether Minnesota or Wisconsin law applies, this dispute is

immaterial because the elements of a contract claim are the same in both states.

To form a contract, there must be a specific and definite offer, acceptance,

and consideration. See Taxi Connection v. Dakota, Minn. & E. R.R. Corp., 513

F.3d 823, 826 (8th Cir. 2008); Larimer v. Dayton Hudson Corp., 137 F.3d 497, 502

(7th Cir. 1998). There must be a "meeting of the minds with respect to [the

alleged contract's] essential terms." Larimer, 137 F.3d at 502; Minneapolis

Cablesystems v. City of Minneapolis, 299 N.W.2d 121, 122 (Minn. 1980).

Both parties agree that there was no written contract between ASC and

CJS, but they dispute whether an oral contract was formed.  ASC claims that an

oral contract was created when Mike Podgorak allegedly agreed at the January

10 meeting to be present at the docking of the McCarthy.  ASC Marine

Superintendent Ken Gliwa has stated that Podgorak promised to be present for

the McCarthy's docking (Gliwa Dep. at 269:8-21), but Podgorak has denied

making any such promise (Podgorak Dep. at 189:8-10).

CJS argues that, regardless of the factual discrepancy between the accounts

of the January 10 meeting given by Gliwa and Podgorak, no contract could have

been formed because no consideration was given for Podgorak's alleged

promises, nor was there a meeting of the minds on the essential terms of the

alleged contract.

### a.  Consideration.

CJS argues that there is no evidence that ASC compensated or promised to

compensate CJS for the services that Podgorak allegedly promised to perform.

ASC acknowledges that it made no direct payments to CJS but argues it did

provide compensation for Podgorak's work through its payments to Fraser.

The relationship between CJS, RJS, Reuben Johnson & Son, Inc. ("Reuben

Johnson"), and Fraser is complicated.  During the time of the incident at issue in

61

this case, Todd Johnson was the majority stakeholder of Reuben Johnson, of which both RJS and Fraser were first tier subsidiaries.  Todd Johnson was also the sole owner of CJS.  Mike Podgorak was an employee of Chris Jensen and he directly supervised RJS employees, and RJS coordinated and billed for work performed by Podgorak.

Records show that Podgorak indicated on his time sheets that he spent time working on the McCarthy docking between January 10 and 14.  RJS billed Fraser for time spent by Podgorak on that work.  Fraser, in turn, was ultimately paid by ASC to provide "line and anchor handling at arrival and departure of lay-up."  ASC argues that these payments are sufficient to show consideration provided in exchange for Podgorak's alleged promise to be present at the McCarthy's docking.  CJS argues that this evidence shows only that Podgorak's work was charged to and paid by Fraser, not by ASC.

Viewing the evidence in the light most favorable to ASC, it appears that CJS was compensated for Podgorak's work through the payments made to Fraser and that ASC did provide consideration for the promises that Podgorak allegedly made.

### b. Meeting of the Minds

Whether parties to an alleged contract mutually agreed on the contract or had a "meeting of the minds" is generally a fact issue reserved for the jury. See, e.g., Olson v. E.F. Hutton & Co., Inc., 957 F.2d 622, 626 (8th Cir. 1992). CJS argues that any alleged agreement between ASC and CJS was too indefinite to be considered a valid contract. CJS further argues that the fact that Podgorak denies agreeing to be present for the McCarthy's docking shows that there was no "meeting of the minds" between him and Gliwa. CJS points to Podgorak's statements that his main function was to examine the dock in order to determine if it would be possible to plow snow and allow access to the McCarthy. CJS argues that ASC's assertion that Podgorak had agreed to help guide and spot the McCarthy is not credible because CJS employees had not done such work in the past.

In its consideration of CJS's motion for summary judgment, the Court must view the evidence in the light most favorable to ASC. Gliwa has testified that he told Podgorak that he might not be able to be present at the docking, that Podgorak promised to be present at the docking, that they "shook hands on it," and that Gliwa expected Podgorak to be present. (Gliwa Dep. at 269:8-21.) In

spite of ASC's evidence to the contrary, this testimony creates a genuine issue of fact on the issue of mutual assent.

Because there remain genuine issues of material fact with respect the formation of a contract between ASC and CJS, the Court will CJS's motion for summary judgment as to Count II.

### 2. Count III—Implied Warranty of Workmanlike Performance

As discussed above, a contractor who "contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner." N. Ins. Co. of N.Y., 579 F.3d at 67. A claim for breach of an implied warranty of workmanlike performance therefore requires the existence of a contract. CJS reiterates its argument that no contract existed between it and ASC. As discussed above, however, the existence of a contract remains a live issue, so summary judgment on Count III would not be appropriate at this time.

### H. Reuben Johnson & Son and RJS Construction's Motion for Partial Summary Judgment

Defendants Reuben Johnson & Son, Inc. ("Reuben Johnson") and RJS Construction, LLC ("RJS") have moved for summary judgment on the counts of ASC's complaint directed at them. They have also moved for summary

judgment on the cross claims brought by Hallett and Fraser for contribution and

indemnity.

Of the six counts ASC brought against Reuben Johnson and RJS, ASC now

concedes that Count IV (breach of implied warranty of fitness for a particular

purpose) and Count V (breach of express warranty) should be dismissed.  ASC

argues, however, that summary judgment is not warranted as to the Count I

(negligence), Count II (breach of contract), Count III (breach of implied warranty

of workmanlike performance), and Count VI (negligent representation).

### 1.  ASC's Claims against Reuben Johnson and RJS

The key question with respect to ASC's claims against Reuben Johnson

and RJS is whether CJS employee Podgorak's actions can be imputed to those

companies.  Reuben Johnson and RJS argue that they simply have no connection

to Podgorak or the McCarthy accident.  No employee of either company was

involved with the docking of the McCarthy, nor was any formal contract or

agreement entered into with Reuben Johnson or RJS.  ASC contends that Reuben

Johnson and RJS are liable through Podgorak's actions because he acted as their

representative.

As evidenced by his W-2 forms, Podgorak is employed by CJS as a truck supervisor.  (Gatto Suppl. Decl. [Docket No. 261], Ex. 2.)  At the same time, as discussed above, the relationships between CJS, Reuben Johnson, and RJS are complicated.  RJS is a wholly owned subsidiary of Reuben Johnson.  CJS is a separate corporation but its majority shareholder owner, Todd Johnson, is also the majority shareholder of Rueben Johnson.  RJS tracks and bills for Podgorak's time.

The Court has already determined that ASC's claims arising out of an alleged oral contract with Podgorak and CJS should survive the summary judgment.  ASC argues that the alleged oral contract that Podgorak entered into with ASC also implicated RJS and Reuben Johnson.   ASC points to several pieces of evidence which indicate that Podgorak's actions should be imputed to Reuben Johnson and RJS in addition to CJS.  First, Ken Gliwa has stated that Podgorak told him that he attended the January 10 meeting to represent Fraser and "Reuben Johnson/RJS."  (Gliwa Aff. ¶ 3.)  Second, Podgorak arrived at the January 10 meeting driving a Reuben Johnson pickup truck with a Reuben Johnson logo on the door.  (Podgorak Dep. at 98:20-99:17.)  Third, Podgorak has stated that he attended the January 10 meeting to represent both Fraser and

Reuben Johnson.  (Id. 9:1-4, 123:3-6.)  Fourth, Hallett President Mike McCoshen

was also under the belief that Podgorak had attended the January 10 meeting as

a representative or employee of RJS or Reuben Johnson.  (McCoshen Dep. at 93:1-

4.)

Reuben Johnson and RJS take issue with some of these assertions.  They

note that Gliwa stated in his deposition that Podgorak told him that he

represented Fraser, but Gliwa did not mention Podgorak's representation of

Reuben Johnson or RJS.  Only later, in an affidavit, did Gliwa say that Podgorak

stated that he was representing all three companies (Fraser, Reuben Johnson, and

RJS).  Reuben Johnson and RJS urge that this Court should not consider the

statement in Gliwa's affidavit.  See Dotson v. Delta Consol. Industries, Inc., 251

F.3d 780, 781 (8th Cir. 2001) ("[A] party may not create a question of material

fact, and thus forestall summary judgment, by submitting an affidavit

contradicting his own sworn statements in a deposition.").

Here it is not so clear that Gliwa's two statements are contradictory.  At

his deposition, in a response to a question about whether he had said something

to Podgorak which he apparently understood, Gliwa stated: "If I remember right,

which I don't offhand, it was something to do with, you know, are you're the

representative from Fraser Shipyard, representing Gene Walroos and Fraser

Shipyard." (Gliwa Dep. at 201:8-14). This statement is not necessarily

contradicted by Gliwa's later assertion that Podgorak had told him that he

represented Reuben Johnson and RJS in addition to Fraser.

Further, while RJS and Reuben Johnson acknowledge Podgorak's own

statement that he attended the January 10 meeting as a representative of Reuben

Johnson (in addition to Fraser), they dispute the scope of that representation.

They note that Podgorak stated that he was at the meeting to discuss Reuben

Johnson's participation in snow removal from the dock, not with the docking of

the McCarthy.

Taking the evidence in the light most favorable to ASC, a reasonable juror

could conclude that Podgorak was representing Reuben Johnson and RJS at the

January 10 meeting. As discussed above, the business relationships between

Reuben Johnson, RJS, and CJS are interwoven and complex. Given the complex

factual disputes as to the nature of scope of Podgorak's representation of Reuben

Johnson and RJS, the Court will not grant summary judgment as to the claims

arising out of the alleged oral contract formed between Podgorak and ASC.

68

## 2. Negligence and Negligent Representation Claims

The parties dispute whether Reuben Johnson or RJS could have owed any duty to ASC which would give rise to a negligence claim.  Reuben Johnson and RJS note they are construction companies, not wharfingers.  They therefore argue that they owed no duty to warn or otherwise advise ASC about any problems with Hallett's Dock No. 8.

In response, ASC does not argue that Reuben Johnson or RJS owed it duties as wharfingers.  Instead, ASC contends that Reuben Johnson and RJS owed ASC a duty of care based on Podgorak's statements.  ASC argues that when Podgorak attended the January 10 meeting, he agreed to communicate docking instructions to Whitehead (a Fraser employee) and also to be present when the McCarthy was to be docked.  ASC argues that, as a result of Podgorak's statements, he and the companies that he represented had a duty to conform to a particular standard of conduct.  To the extent that Podgorak failed to inform Whitehead of the docking instructions, forgot to relay the fact that there was debris in the slip, or left the dock before docking was complete, ASC argues that Podgorak (along with Reuben Johnson and RJS) breached that standard of care.  Moreover, ASC argues that Reuben Johnson and RJS were

negligent in allowing Podgorak, an inexperienced truck driver, to represent them

at the January 10 meeting.

Viewing the evidence in the light most favorable to ASC, the Court

concludes that Rueben Johnson and RJS, while not subject to the same duties as a

wharfinger, may nonetheless be liable for negligence to the extent that Podgorak

acted as their representative.  The motion for summary judgment as to

negligence and negligent misrepresentation will therefore be denied.

### 3.  Cross Claims

Hallett and Fraser have brought cross claims against Reuben Johnson and

RJS for contribution and indemnification.  Indemnification and contribution are

both equitable remedies.  Contribution requires that parties "under a common

burden share that burden equitably."  <u>A.P.I., Inc. v. Home Ins. Co.,</u> 706 F. Supp.

2d 926, 946 (D. Minn. 2010).

> In contrast to contribution, which allows one to recover a
> proportionate share from the other liable party, indemnity is the
> right of one party held liable to another to shift the entire burden of
> liability to a third party also liable for the same harm.

<u>United States v. J & D Enterprises of Duluth,</u> 955 F. Supp. 1153, 1157 (D. Minn.

1997) (alterations and citations omitted).  Reuben Johnson and RJS argue that

these cross claims should be dismissed because they share no liability to ASC

with the other Defendants.  Because the Court concludes that some of ASC's

claims against Reuben Johnson and RJS survive summary judgment, the Court

declines to dismiss the cross claims at this time.  The Court again reiterates,

however, that damages proven in this case will be apportioned between the

contributing parties based on the jury's assessment of their relative fault for the

accident.


Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED:**

1. The Motions to Supplement the Record [Docket Nos. 266, 276, 311] are **GRANTED** and Plaintiffs' Motion to Strike [Docket No. 286] is **DENIED**.

2. Plaintiffs' Motion for Partial Summary Judgment Against All Defendants on Damages Related to Repair Costs and Expenses [Docket No. 164] is **DENIED;**

3. Plaintiffs' Motion for Partial Summary Judgment against Defendant Hallett Dock Company  [Docket No. 160] is **GRANTED IN PART** and **DENIED IN PART** as follows:
   a. The <u>Pennsylvania</u> Rule applies to Hallett Dock Company's actions;
   b. Summary judgment is **DENIED** in all other respects;

4. Defendant Hallett Dock Company's Motion for Partial Summary [Docket No. 168] is **GRANTED IN PART** and **DENIED IN PART** as follows:

     a. Count IV (breach of implied warranty of fitness for a particular purpose) is **DISMISSED**;

     b. All other counts **REMAIN**;

5. Defendant Fraser Shipyards, Inc.'s Motion for Summary Judgment [Docket No. 173] is **GRANTED IN PART** and **DENIED IN PART** as follows;

     a. Count IV (breach of implied warranty of fitness for a particular purpose) and Count V (breach of express warranty) are **DISMISSED**;

     b. All other counts **REMAIN**;

6. Defendant Chris Jensen & Son, Inc.'s a Motion for Partial Summary Judgment [Docket No. 156] is **GRANTED IN PART** and **DENIED IN PART** as follows;

     a. Count IV (breach of implied warranty of fitness for a particular purpose) and Count V (breach of express warranty) are **DISMISSED**;

     b. All other counts **REMAIN;**

7. Defendants RJS Construction LLC and Reuben Johnson & Son, Inc.'s Motion for Partial Summary Judgment [Docket No. 151] is **GRANTED IN PART** and **DENIED IN PART** as follows:

     a. Count IV (breach of implied warranty of fitness for a particular purpose) and Count V (breach of express warranty) are **DISMISSED**;

     b. All other counts and cross claims **REMAIN;**

Dated:  March 23, 2012           <u>s/Michael J. Davis</u>

                                  Michael J. Davis
                                  Chief Judge
                                  United States District Court